UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH GATTO,

                              Plaintiff,

            - against -

FUJITEC AMERICA, INC.,

                              Defendant.

**MEMORANDUM
OPINION & ORDER**

21 Civ. 9754 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        In this action, Plaintiff Joseph Gatto claims that his former employer, Defendant

Fujitec America, Inc. ("Fujitec" or the "Company"), refused to pay him incentive compensation

that he was entitled to under incentive compensation agreements that he had entered into with the

Company.  The Complaint alleges breach of contract, quantum meruit, unjust enrichment, and

violations of New York Labor Law ("NYLL") §§ 191 and 193, as well as retaliation in violation

of NYLL § 215.

        The parties have cross-moved for summary judgment.  (Dkt. Nos. 35, 38)  For the

reasons stated below, Defendant Fujitec's motion will be granted, and Plaintiff Gatto's motion

will be denied.

**BACKGROUND**

I.    <u>FACTS</u>[1]

   A.    <u>Gatto's Employment at Fujitec</u>

   Fujitec "installs and maintains elevators, escalators, autowalks, and controls for commercial clients." (Def. R. 56.1 Stmt. (Dkt. No. 44) ¶ 66)

   Plaintiff Gatto "has over 28 years of experience in the elevator/service repair business." (Pltf. R. 56.1 Stmt. (Dkt. No. 35-11) ¶ 4)  On June 3, 2019, Gatto accepted a "Service Sales" position at Fujitec, in its Clifton, New Jersey office. (Pltf. Mot., Ex. G (Dkt. No. 35-8) at 1; id., Ex. B (Pltf. Dep.) at 28-29)[2]  In his Service Sales position, Gatto "handled all account sales related issues for the accounts that were assigned to [him]," and sought to obtain new service and repair contracts for Fujitec. (Pltf. Dep. (Dkt. No. 35-3) at 32)

   On March 1, 2020, Plaintiff Gatto was promoted to Service Sales Manager. (Rennekamp Decl. II, Ex. A (Dkt. No. 45-1) at 5; Pltf. R. 56.1 Stmt. (Dkt. No. 35-11) ¶ 9)  As a Service Sales Manager, Plaintiff Gatto was expected to "manag[e] the overall company portfolio

----

[1]  The Court's factual statement is drawn from the parties' Local Rule 56.1 statements and accompanying exhibits.  To the extent that this Court cites facts drawn from a movant's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).  "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party.  Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (internal citations omitted).  Unless otherwise indicated, the facts cited by the Court are undisputed.
[2] Except as to deposition transcripts, the page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.  With respect to deposition transcripts, the Court cites to the pagination assigned by the court reporter.

as well as key accounts while supervising account managers." (Pltf. Mot., Ex. H ("Manager Job Description") (Dkt. No. 35-9) at 1) While Gatto's "primary duties [in his new position] were supervisory and management, [he] also had [his] own [customer] accounts." (Pltf. Dep. (Dkt. No. 35-3) at 59) As a Service Sales Manager, Gatto "oversaw Defendant's contracts with its clients involving both service and repair contracts." (Pltf. R. 56.1 Stmt. (Dkt. No. 35-11) ¶ 15)

Gatto's compensation at Fujitec included a salary as well as a "commission fee based on the number of completed sales and services contracts." (Def. R. 56.1 Stmt. (Dkt. No. 44) ¶ 86) The payment structure and requirements for the commission fee program are set forth "in the 2019 and 2020 Sales Incentive Program agreements that [Gatto] signed each year." (Id. ¶ 87; Pltf. Mot., Ex. E (Incentive Program Agreements) (Dkt. No. 35-6))

The Sales Incentive Program Agreements for 2019 and 2020 state that "[t]he Fujitec America, Inc. Sales Incentive Plan (SIP) is a discretionary plan designed to reward Sales Performance through individual efforts and accomplishments." (Incentive Program Agreements (Dkt. No. 35-6) at 1, 11) As such, the purpose of the Sales Incentive Program was to incentivize and reward sales employees for bringing in new business. (Id.) The 2019 Agreement states that it applies to "sales made (booked) from 1/1/19 and on," while the 2020 Agreement states that it applies to "sales made (booked/complete/paid in full) from 1/1/20 and on." (Id.)

The 2019 and 2020 Sales Incentive Program Agreements describe a four-step process to qualify for incentive compensation on repair sales: the repair must have been "fully completed," the bill for the repair must have been sent out, the job must be closed in the Company's billing system, and the customer must have paid for the repair in full. (Id. at 3, 13) Incentive compensation cannot be determined or paid before those four steps occur because, "among other things, customers could cancel orders" or "customers could change their orders."

(Def. R. 56.1 Stmt. (Dkt. No. 44) ¶¶ 106-07)[3]  Each sale that Gatto made in 2019 was a repair

sale.[4]  (Def. R. 56.1 Stmt. (Dkt. No. 44) ¶ 94)

        Fujitec does not bill a customer for service or a repair until the customer's account

is "closed" in the Company's billing system.  (See Pltf. R. 56.1 Stmt. (Dkt. No. 35-11) ¶ 45

(stating that "[a]fter the account is closed," Defendant's billing clerk sends a final bill to the

customer (citing Antonello Dep. (Dkt. No. 35-4) at 43:15-44:20)); Def. R. 56.1 Counterstmt.

(Dkt. No. 45) ¶ 45 (noting that Antonello testified that the "client is to be billed after the work

ticket [for a sale] is closed" (citing Antonello Dep. (Dkt. No. 35-4) at 43:7-14))  "Once the

client's check for the final bill was delivered to [Fujitec], [Fujitec]'s [incentive compensation]

---

[3]  Plaintiff asserts that this is a disputed fact, "because the incentive payments owed to Plaintiff
that are the subject of this case concern Defendant's customers whose orders were already
completed, but not fully closed out and submitted for incentive consideration due to the
unjustified delay by some of defendant's higher up employees for longer than what was industry
norms."  (Pltf. R. 56.1 Counterstmt. (Dkt. No. 42-1) ¶ 106)  But Plaintiff's counterstatement is
not responsive to Defendant's assertion that completion of the four steps set forth in the Sales
Incentive Program Agreements was necessary because customers sometimes cancel orders or
change their orders.  Because Plaintiff has not offered evidence that this explanation is false,
Defendant's factual assertion is deemed admitted.

In any event, Plaintiff's factual citations (see id. (citing Antonello Dep. (Dkt. No. 35-4) at 47:16-
25; Pltf. Dep. (Dkt. No. 35-3) at 36-40) do not support his assertion that the orders at issue in this
case "were already completed, but not fully closed out."  Moreover, as discussed below,
Plaintiff's right to incentive compensation under the Sales Incentive Program Agreements is
governed by the provisions of those agreements, and not by what Plaintiff may view as
"unjustified delay" or a violation of "industry norms."

[4]  Plaintiff states that this fact is "[d]isputed because there are more sales and sources from which
Plaintiff is claiming he is owned incentive payments from Defendant.  Complaint, ¶¶ 27-31."
(Pltf. R. 56.1 Counterstmt. (Dkt. No. 42-1) ¶ 92)  But Plaintiff does not explain which of his
2019 sales were not repair sales, nor does he cite admissible evidence demonstrating that he
made sales in 2019 that were not repair sales.  Accordingly, Defendant's factual assertion is
deemed admitted.

policy considered the account ready for incentive consideration." (Pltf. R. 56.1 Stmt. (Dkt. No. 35-11) ¶ 46)

Both the 2019 and the 2020 Sales Incentive Program Agreements provide that,

> [t]o receive an incentive payment, an individual must be an employee of Fujitec America, Inc. at least forty-five (45) days after the end of an applicable quarter as a condition of eligibility. Incentives are not earned until this time period has passed. Employees resigning or discharged with cause prior to the end of this period forfeit their right to an incentive payment; retirements require President and HR approval as it is at their discretion.

(Id. at 9, 19 (emphasis in original)) In order to be eligible for an incentive payment, a "'demonstrated' Sales Effort [is] required in all cases," and "[u]ltimate discretion is vested in [Fujitec's] President and that decision is final." (Id.) (emphasis in original) Each Incentive Program Agreement also states that "ALL INCENTIVE PAYMENT[s] ARE SUBJECT TO REVIEW AND MODIFICATION BY [Fujitec's] PRESIDENT AND AWARDED AT HIS DISCRETION." (Id. at 10, 20) (emphasis in original)

## B.    Gatto's Termination

In July 2020, Gatto sought incentive compensation for an elevator repair that he had overseen. (Antonello Decl., Ex. A (Dkt. No. 41) at 5) Chris Kissner, Gatto's manager, told Gatto that the "repair order[] had not been 'closed out' and therefore the incentive compensation associated with that repair order would not be paid to [Gatto] until a later time." (Def. R. 56.1 Stmt. (Dkt. No. 44) ¶ 108; Antonello Decl., Ex. B (Dkt. No. 41) at 8)[5]

---

[5]  In his response to Defendant's Local Rule 56.1 Statement, Plaintiff states that this statement is disputed, but Plaintiff does not dispute that Kissner said this to him. What Gatto disputes is whether he was entitled to an immediate payment of incentive compensation in connection with this repair. (See Pltf. R. 56.1 Counterstmt. (Dkt. No. 42-1) ¶ 108) (stating that Paragraph 108 is "[d]isputed because the incentive payments owed to Plaintiff that are the subject of this case concern Defendant's customers whose orders were already completed, but not fully closed out and submitted for incentive consideration due to the unjustified delay by some of defendant's higher up employees for longer than what was industry norms"))

In a July 14, 2020 email to Chuck Lindsey – Fujitec's Senior Manager of Information Technology – about this repair, Gatto stated that he "would like to get paid for this in Q2. The job is completed and we are paid in full. If you can help it would be greatly appreciated." (Antonello Decl., Ex. A (Dkt. No. 41) at 5) Lindsey brought Gatto's request to the attention of Daiji Yoshimura, Fujitec's chief financial officer, telling Yoshimura that the repair had been made and the customer had paid, "but both the [repair] ticket and contract [remained] open[] [in Fujitec's billing system]." (Id. at 4) In a July 14, 2020 email, Yoshimura informed Gatto that "[t]his repair contract has not closed yet," and that "if [Gatto] want[s] to recognize the remaining revenue and profit for this repair work in July, please close this repair contract in [Fujitec's system] first." (Id.)

On July 15, 2020, Kissner issued a Corrective Action Form to Gatto, asserting that Gatto had acted in "[d]isregard of Company Policy in regard to communication and going above direct reports to HQ." (Id., Ex. B (Dkt. No. 41) at 8) In the Corrective Action Form, Kissner states that, "[a]fter having already been instructed that a repair order was not closed out completely and would not be on his 2nd Quarter [incentive compensation] report, [Gatto] still went above and beyond to Chuck Lindsey[,] which in turn was elevated to the company's CFO." (Id.) In the Corrective Action Form, Kissner warned Gatto that "[i]f improvements are not made by 8/1/20, [Gatto would] be written up again and face possible disciplinary actions up to possible termination depending on the level of severity." (Id.)

"In 2019 and 2020, multiple salespeople in the Clifton[, New Jersey] office left Fujitec." (Def. R. 56.1 Stmt. (Dkt. No. 44) ¶ 115) In October 2020 – after these departures – Gary Krupp, Fujitec's president, reviewed the August 2020 and September 2020 rankings for Fujitec sales employees. (Rennekamp Decl. (Dkt. No. 44-1) ¶ 7; id., Ex. A (Dkt. No. 44-1) at 6-

7)  Krupp noticed that the sales rankings for August 2020 showed that Gatto ranked eighth in year-to-date service and repair bookings, with just over $500,000 in sales, while in the September 2020 sales rankings, Gatto had jumped to first place with $3.3 million in year-to-date bookings.  (Id., Ex. A (Dkt. No. 44-1) at 6-7)  "Krupp contacted Louis Antonello, Fujitec's Branch Manager for the New York region," and asked him to investigate why Gatto's sales had increased so significantly over a one-month period.  (Def. R. 56.1 Stmt. (Dkt. No. 44) ¶¶ 120-121)

"[W]hen one of [Fujitec's sales service] employees managing an account left its employ, another one of [Fujitec's sales service] employees would have to take over the account and initiate contact with the client for the remainder of the [service] contract[,] because 'someone has to handle the account[].'"  (Pltf. R. 56.1 Stmt. (Dkt. No. 35-11) ¶ 17 (quoting Antonello Dep. (Dkt. No. 35-4) at 69:15-16))

Antonello's investigation revealed that Gatto had sent an email request to Chuck Lindsey – Fujitec's Senior Manager of Information Technology – asking him to "modify [repair contracts], and put [the] . . . repair contracts in [his] name or [in] Rossi Radice['s name]."  (Pltf. Dep. (Dkt. No. 35-3) at 96; Pltf. R. 56.1 Stmt. (Dkt. No. 35-11) ¶¶ 58-59)  Radice was the other remaining Fujitec Service Sales Manager.  (Id. at 93)

When Krupp learned that Gatto had arranged for repair orders that had been obtained by departed Fujitec salespeople to be modified to list Gatto as the responsible Fujitec employee, "he[ was] kind of upset . . . [a]nd he said ['w]ho approved this, this is against company policy.[']"  (Def. R. 56.1 Stmt. (Dkt. No. 44) ¶ 122 (quoting Antonello Dep. (Dkt. No. 35-4) at 89:7-16))

Shortly thereafter, Gatto's supervisor – Chris Kissner – questioned Gatto about why he had arranged for Chuck Lindsey to add Gatto's name to these repair orders.  (See Pltf. Dep. (Dkt. No. 35-3) at 114 ("I responded to [Chris Kissner's] email in regards to this, telling him what I did"))  Gatto told Kissner that "the reason [he was] doing it [wa]s to find out what the [status] is with all these jobs."  (Id.)  Kissner did not believe Gatto's explanation.  (Id. at 115)

"On October 8, 2020, in the presence of Louis Antonello, [branch manager for the New York region, Gatto] was interviewed . . . by Julia Mourer, Fujitec Human Resources Manager" concerning his decision to have his own name listed on repair orders that had been obtained by other Fujitec employees who had left the company.  (Def. R. 56.1 Stmt. (Dkt. No. 44) ¶ 125)

In an October 12, 2020 letter, Fujitec informed Gatto that his employment was being terminated for cause:

> This letter confirms our discussions with you last Monday, October 12, 2020 informing you that your employment with Fujitec America Inc. was being terminated due to a serious violation of our company policy.
>
> Specifically, it was discovered that you willfully violated the 2020 Sales Incentive Program by assigning [incentive compensation] to yourself and another employee without your supervisors' authorization.  This would have resulted in you receiving Incentives that you were not entitled to and/or authorized to receive.

(Def. R. 56.1 Stmt. ¶ 127 (citing Rennekamp Decl., Ex. B (Dkt. No. 40) ¶ 9); see also Def. R. 56.1 Counterstmt. (Dkt. No. 45) ¶ 59) (quoting Antonello Dep. (Dkt. No. 35-4) at 98:4-99:9) (testifying that "'[Gatto was terminated for] just going directly to the IT guy and putting the accounts, the repair orders in his name for a gain'"))[6]

---

[6] Gatto disputes that he was terminated for cause, stating that his "email request to Mr. Lindsay for reassignment of the repair contracts did not break any written policy enacted by Defendant." (Pltf. R. 56.1 Stmt. (Dkt. No. 35-11) ¶ 59 (citing Antonello Dep. (Dkt. No. 35-4) at 98:10-25))

Although Fujitec says that Gatto was terminated for cause – and was thus not eligible to receive incentive compensation under the Sales Incentive Program Agreements – "Fujitec elected to pay [Gatto] $13,275.00 after his termination for sales that Mr. Gatto booked, that were completed and that were paid in full by the customer by the time of Mr. Gatto's termination." (Def. R. 56.1 Stmt. (Dkt. No. 44) ¶ 132 (citing Rennekamp Decl. (Dkt. No. 40) ¶ 10); id., Ex. C)[7]

## II.    PROCEDURAL HISTORY

The Complaint was filed in Supreme Court of the State of New York, New York County, on September 28, 2021. (Cmplt. (Dkt. No. 1-1) at 2) On November 23, 2021, Defendant Fujitec removed the action to this District. (Notice of Removal (Dkt. No. 1)) Removal is premised on diversity jurisdiction. (Id.)

---

Gatto asserts that "[a]t the time of [his] termination, he had performed the necessary work on the accounts identified in the Complaint to be eligible for incentive payments." (Id. ¶ 60 (citing Pltf. Dep. (Dkt. No. 35-3) at 44:9-13)) As such, Gatto claims that "Defendant terminated [his] employment in order to avoid paying him the lucrative incentives he would otherwise be entitled to." (Id. ¶ 61 (citing Pltf. Dep. (Dkt. No. 35-3) at 48:2-11))

While nothing in the record supports Gatto's claim that he was entitled to recover incentive compensation under the Sales Incentive Program Agreements for work orders brought in by departed Fujitec employees, this Court need not resolve the parties' factual dispute because – as explained below – these Agreements vest absolute discretion in Fujitec in determining any incentive compensation award.

[7] Gatto states that he disputes Fujitec's assertion that it paid him incentive compensation for sales that he booked, that were completed, and that were paid in full by the time of his termination. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 42-1) ¶ 132) There does not appear to be a dispute on this point, however. In his Local Rule 56.1 Counterstatement, Gatto says that "the incentive payments owed to Plaintiff that are the subject of this case concern Defendant's customers whose orders were already completed, but not fully closed out and submitted for incentive consideration due to the unjustified delay by some of defendant's higher up employees for longer than what was industry norms." (Pltf. R. 56.1 Counterstmt. (Dkt. No. 42-1) ¶¶ 106-108) Accordingly, Gatto does not dispute that Fujitec paid him for service and repair orders that were completed and paid in full at the time of his termination.

In the Complaint, Gatto contends that he is entitled to incentive compensation in connection with twenty-nine repair orders that have sales dates between February 2, 2019 and November 21, 2019.[8]  Gatto also seeks incentive compensation in connection with twenty-one repair orders that have sales dates between January 2, 2020 and October 1, 2020.  (Cmplt. (Dkt. No. 1-1) ¶ 27)  Gatto asserts that – in connection with these repair orders – he is entitled to incentive compensation amounting to $212,184.07.  (Id.)

---

[8]  Given that Fujitec did not hire Gatto until June 3, 2019, it is not clear why he would qualify for incentive compensation based on repair orders obtained by other Fujitec employees between February 2, 2019 and June 3, 2019.  Gatto does not explain in the Complaint, in his Local Rule 56.1 Statement, or in his briefing why he is entitled to incentive compensation based on repair orders that other Fujitec employees secured prior to his arrival.  As to record citations that allegedly support his claim that "Defendant failed to pay Plaintiff commissions and additional compensation," and that he is "entitled to a $15,000 bonus in addition to the other undercompensation alleged" (Pltf. R. 56.1 Stmt. (Dkt. No. 35-11) ¶¶ 62-63), Gatto cites his deposition testimony:

> Q. What were you told about why you were being promoted?
>
> A. Like I said, when I was originally interviewed that was their intention to promote me to this job or assign me to this job.  As events pla[y]ed out, I was the number one sales rep in the company for six months.  I sold more than anybody in the whole country for six months.  I was only there for six months.  I sold more than anybody else.  I had  the background and it was all about the compensation, you know, originally they gave me an offer, I refused it.  Then they came back and they offered me 50 percent increase in my pay.
>
> But keep in mind that, I don't know if  you are privy to this, I not only was the sales manager, regional sales manager, I also had a full account manager's duty as well.  They had not hired a new account manager to take care of all the accounts I had.  The long-term goal was to phase me out of the accounts and handle key accounts as part of my job, but all the time that I was there, I was carrying both loads.

(See id. (citing Pltf. Dep. (Dkt. No. 35-3) at 34:20-35:16))

Gatto's deposition testimony does not address why he is entitled to incentive compensation for repair orders brought in by other Fujitec employees long before he arrived at the Company.  Accordingly, he has not proffered evidence that creates a material issue of fact as to whether he is entitled to incentive compensation for these orders.

Gatto also seeks incentive compensation for four service contracts. The Complaint does not specify when these service contracts were sold. In connection with these service contracts, Gatto claims that he is entitled to (1) incentive compensation amounting to $72,900 (id.); and (2) new service business bonuses amounting to $15,000. (Id. ¶ 29)

On January 3, 2023, following the close of discovery, the parties filed cross-motions for summary judgment. (Dkt. Nos. 35, 38)

## DISCUSSION

## I. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is warranted where the moving party "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)). "'[T]hat opposing parties assert competing versions of the same event is not in itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'" Yi Fu Chen v. Spring Tailor, L.L.C., 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (alterations in original) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)). However, "'[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (second alteration and omissions in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)). Moreover, "'[t]he principles governing admissibility of evidence do not change on a motion for summary judgment[,]' and district courts need only consider admissible evidence in ruling on a motion for summary judgment." I.M. v. United States, 362 F. Supp. 3d 161, 174 n.9 (S.D.N.Y. 2019) (quoting Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)).

"'Where, as here, the burden of persuasion at trial would be on the non-moving party[,] . . . the party moving for summary judgment may satisfy [its] burden of production under Rule 56 in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim.'" Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017) (quoting Farid v. Smith, 850 F.2d 917, 924 (2d Cir. 1988)).

"The same standard[s] appl[y] where, as here, the parties file[] cross-motions for summary judgment. . . ." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues

12

of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. (internal citations omitted).

**B.** **Breach of Contract**

Under New York law, the elements of a breach of contract claim are "'(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" Mindspirit, LLC v. Evalueserve Ltd., 346 F. Supp. 3d 552, 574 (S.D.N.Y. 2018) (quoting Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 188-89 (S.D.N.Y. 2011)).

"[A] contract is defined under New York law [as] 'an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound.'" Fisher v. Int'l Student Exch., Inc., 38 F. Supp. 3d 276, 282 (E.D.N.Y. 2014) (quoting Kowalchuk v. Stroup, 61 A.D.3d 118, 121 (1st Dep't 2009)). "'To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms.'" Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 95 (2d Cir. 2007) (quoting Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp., 93 N.Y.2d 584, 589 (1999)).

"Generally, courts look to the basic elements of the offer and the acceptance to determine whether there was an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." Starke v. SquareTrade, Inc., 913 F.3d 279, 289 (2d Cir. 2019) (citing Express Indus., 93 N.Y.2d at 589). "'[A] mere agreement to agree, in which a material term is left for future negotiations, is unenforceable.'" Tractebel Energy Mktg., 487 F.3d at 95 (alteration in original) (quoting Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, 52 N.Y.2d 105, 109 (1981)). However, "'not all terms of a contract need be fixed with absolute

certainty.'" Id. (quoting Express Indus., 93 N.Y.2d at 589). "'[A] contract is not necessarily lacking in all effect merely because it expresses the idea that something is left to future agreement.'" Id. (alteration in original) (quoting May Metro. Corp. v. May Oil Burner Corp., 290 N.Y. 260, 264 (1943)).

       "Under New York law, 'if a contract is unambiguous on its face, its proper construction is a question of law' that may be resolved on summary judgment." LVP Assocs. L.L.C. v. Bank of China, New York Branch, 17 Civ. 5274 (SHS), 2017 WL 5514523, at *4 (S.D.N.Y. Nov. 16, 2017) (quoting Gaia House Mezz LLC v. State St. Bank & Tr. Co., 720 F.3d 84, 89 (2d Cir. 2013)). "[W]hether the contract is ambiguous is [also] a question of law for the court." Law Debenture Tr. Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 465 (2d Cir. 2010). "Contract provisions are unambiguous if they 'have a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion.'" LVP Assocs., 2017 WL 5514523, at *4 (quoting Breed v. Ins. Co. of N. Am., 46 N.Y.2d 351, 355 (1978)). By contrast, a contract is ambiguous "where its language is susceptible to multiple reasonable interpretations." Summit Health, Inc. v. APS Healthcare Bethesda, Inc., 993 F. Supp. 2d 379, 391 (S.D.N.Y. 2014) (citing Brad H. v. City of New York, 17 N.Y.3d 180, 186 (2011)). "Ambiguity will not be found," however, "where one party's view strains the contract language beyond its reasonable and ordinary meaning." Governmental Emps. Ins. Co. v. Ohio Cas. Grp., 47 F. Supp. 3d 190, 194 (S.D.N.Y. 2014) (internal citations and quotation marks omitted). Moreover, "ambiguity does not exist simply because the parties urge different interpretations." Hugo Boss Fashions, Inc. v. Federal Ins. Co., 252 F.3d 608, 616 (2d Cir. 2001) (internal quotation marks and citation omitted).

## II.     ANALYSIS

### A.     Breach of Contract Claim

Gatto contends that Fujitec breached the terms of the Sales Incentive Program Agreements by terminating his employment and then denying him incentive compensation that he had earned under these agreements.  According to Gatto, "there was no written policy prohibiting the conduct for which Defendant based Plaintiff's termination and Plaintiff fulfilled the terms of the IC plans," and thus "should have been entitled to those payments had it not been for his untimely and unlawful firing."  (Pltf. Br. (Dkt. No. 35-10) at 14, 17)

Defendant Fujitec argues that "the decision to grant or deny incentive compensation to Plaintiff is entirely within the discretion of Fujitec, and therefore cannot sustain a claim for breach of contract."  (Def. Opp. (Dkt. No. 47) at 18)  Gatto does not substantively respond to this argument.

As an initial matter, this Court must determine "whether the incentive compensation paid to [P]laintiff and similarly situated employees was a 'bonus' payable at the discretion of the employer, and thus subject to forfeiture, or post employment commissions such as those earned by a sales representative as to which the employer has no right to withhold or, 'earned wages' also not subject to forfeiture."  Weiner v. Diebold Grp., Inc., 173 A.D.2d 166, 167, 568 (1st Dept. 1991).  "In general, and like other contractual entitlements, entitlement to a bonus only exists where the terms of the relevant contract require it."  Vetromile v. JPI Partners, LLC, 706 F. Supp. 2d 442, 448 (S.D.N.Y. 2010).  "Consistent with this rule (and its limitation), where the employee has already earned compensation under the terms of his employment contract, his termination does not affect his rights to that compensation, but where the employer retains discretion to award a bonus (or other compensation), no forfeiture of earned wages occurs if the bonus is not paid."  Id.

"Provisions stating that an employee 'will be entitled to a bonus' do not vest discretion in the employer while provisions stating that the employer reserves the right to 'reduce, modify, or withhold compensation' or that 'distribution of bonuses will be determined by [the employer]' do vest sufficient discretion." Apple Mortg. Corp. v. Barenblatt, 162 F. Supp. 3d 270, 291 (S.D.N.Y. 2016) (quoting Bravia Cap. Partners, Inc. v. Fike, 09 Civ. 6375 (JFK), 2011 WL 6081345, at *4 (S.D.N.Y. Dec. 6, 2011) (collecting cases)).

"It is axiomatic that a promise to pay incentive compensation is unenforceable if the written terms of the compensation plan make clear that the employer has absolute discretion in deciding whether to pay the incentive." O'Shea v. Bidcom, Inc., 01 Civ. 3855 (WHP), 2002 WL 1610942, at *3 (S.D.N.Y. July 22, 2002); see also O'Grady v. BlueCrest Cap. Mgmt. LLP, 111 F. Supp. 3d 494, 501 (S.D.N.Y. 2015), aff'd, 646 F. App'x 2 (2d Cir. 2016) ("It is well established that an employee cannot recover for an employer's failure to pay a bonus under a plan that provides the employer with absolute discretion in deciding whether to pay the bonus." (quoting Smith v. Railworks Corp., 10 Civ. 3980, 2011 WL 2016293, at *3 (S.D.N.Y. May 17, 2011)); Culver v. Merrill Lynch & Co., 94 Civ. 8124 (LBS), 1995 WL 422203, at *3 (S.D.N.Y. July 17, 1995) ("a plaintiff cannot recover under New York law for breach of contract due to his employer's failure to pay him compensation pursuant to a [bonus] plan, where the plan vests the employer with absolute discretion as to the entitlement and amount of any payments thereunder."). "Where an unambiguous contract provides that bonuses are discretionary, a breach of contract claim fails." Id. at 503.

"However, such discretion will not be implied if there exists no contractual provisions assigning the employer absolute discretion to pay such compensation." O'Shea, 2002 WL 1610942, at *3. "When finding that a specific employment contract vested an employer

with the absolute discretion whether to award incentives, courts have relied on clauses that 'unambiguously' vest such power." Id. As such, when evaluating whether a contractual provision in a bonus plan grants the employer discretion to pay the compensation, courts look for "magic words" that unambiguously grant discretion. Culver, 1995 WL 422203, at *3.

For example, in Namad v. Salomon Inc., the New York Court of Appeals held that a contractual provision stating that "[t]he amounts of other compensation and entitlements, if any, including regular bonuses, special bonuses and stock awards, shall be at the discretion of the management" unambiguously "vest[ed] discretion regarding the amount of bonus compensation to be awarded in defendants' management." Namad v. Salomon Inc., 74 N.Y.2d 751, 752–53 (1989). And in Allen v. J.P. Morgan Chase & Co., the court found that a provision stating that "[a]wards are discretionary and reflect J.P. Morgan Chase & Co.'s assessment of a number of considerations, including your teamwork and relative individual, business and Firm performance" was a "clear[] state[ment] that bonus awards are discretionary." Allen v. J.P. Morgan Chase & Co., 06 Civ. 8712 (JGK), 2009 WL 857555, at *15 (S.D.N.Y. Mar. 31, 2009). Conversely, contractual provisions stating that incentive compensation "is subject to approval by executive management," Smith, 2011 WL 2016293, at *3, or that "[d]istribution . . . will be determined by the Division Director and Group Manager, with input from Trading Desk Managers," Culver, 1995 WL 422203, at *3, are not sufficient to vest absolute discretion with the employer.

Here, the 2019 and 2020 Sales Incentive Program Agreements unambiguously grant Fujitec absolute discretion in determining the amount of any incentive payments. Each Agreement provides that "ALL INCENTIVE PAYMENT[s] ARE SUBJECT TO REVIEW AND MODIFICATION BY [Fujitec America, Inc.'s] PRESIDENT AND AWARDED AT HIS

DISCRETION." (Id. at 10, 20 (emphasis in original))  Indeed, both the 2019 and 2020 Sales Incentive Program Agreements begin with the statement that the "Sales Incentive Plan is a discretionary plan designed to reward Sales Performance through individual efforts and accomplishments." (Incentive Program Agreements (Dkt. No. 35-6) at 1, 11 (emphasis added)) And both Agreements provide that, in determining whether a sales employee has made a "demonstrated sales effort" in connection with a particular order – a prerequisite for obtaining incentive compensation – "[u]ltimate discretion is vested in [Fujitec America's] President, and that decision is final." (Id. at 9, 19)

As discussed above, "[i]t is axiomatic that a promise to pay incentive compensation is unenforceable if the written terms of the compensation plan make clear that the employer has absolute discretion in deciding whether to pay the incentive." O'Shea, 2002 WL 1610942; see also Welland v. Citigroup, Inc., 00 CIV. 738 (NRB), 2003 WL 22973574, at *15 (S.D.N.Y. Dec. 17, 2003), aff'd, 116 F. App'x 321 (2d Cir. 2004) ("It is well-established that "[w]here a bonus policy expressly reserves the right to the employer to pay or not pay bonuses, employees cannot claim a vested right or entitlement to payment of a bonus under that policy."); Cohen v. Avanade, Inc., 874 F. Supp. 2d 315, 321 (S.D.N.Y. 2012) ("[U]nder New York law, an employee cannot recover for an employer's failure to pay a bonus under a compensation plan that provides the employer with absolute discretion over bonus determinations."); Hunter v. Deutsche Bank AG, N.Y. Branch, 56 A.D.3d 274, 274 (1st Dept. 2008) ("Plaintiffs' claims for breach of contract lack merit in view of the unambiguous language of their contracts and the employee handbook plainly making bonus awards solely and completely a matter of defendant's discretion.").

Accordingly, Gatto's "breach of contract claim as related to his [incentive compensation] payment is barred by the plain terms of the Agreement[s]," which give discretion to Fujitec's President to determine the amount of any incentive compensation payment. See O'Grady, 111 F. Supp. 3d at 503.[9]

---

[9] In the Complaint, Gatto appears to allege that Fujitec violated the implied covenant of good faith and fair dealing. (See Cmplt. (Dkt. No. 1-1) ¶¶ 53-56 (alleging that "the parties' agreements were subject to an implied covenant of good faith and fair dealing," and that "Defendant's termination of Plaintiff's employment . . . was motivated by Defendant's desire to avoid its obligation to compensate Plaintiff for the commissions he earned from the Agreement.")  Plaintiff has not briefed any implied covenant claim in his summary judgment papers, however, and has thus abandoned any such claim. See Zhang v. Gonzales, 426 F.3d 540, 542 (2d Cir. 2005) (explaining that a plaintiff "abandoned" a claim "by failing to discuss this claim anywhere in his brief."); Annam v. City of New York, 22 Civ. 2945 (LGS), 2023 WL 35053, at *1 (S.D.N.Y. Jan. 4, 2023) ("'[W]hen a party fails adequately to present arguments in a brief, a court may properly consider those arguments abandoned.'" (quoting Malik v. City of New York, 841 F. App'x 281 (2d Cir. 2021) (summary order)).

In any event, there is no support in the record for any implied covenant claim.  Although Gatto asserted, at deposition, that Fujitec was delaying the billing of customers and the completion of jobs "because they didn't want to pay me" (Pltf. Dep. (Dkt. No. 35-3) at 48-49), he admitted that this was merely his "assumption": "[a]ll I can tell you, end result, they weren't billed, they weren't closed out.  I can only assume that they are doing it for their own reasons that they have an objective." (Id. at 79)  But "'[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks, 593 F.3d at 166 (second alteration and omissions in original) (quoting Fletcher, 68 F.3d at 1456).

Moreover, Gatto was an at-will employee.  (See Pltf. Mot., Ex. G (Dkt. No. 35-8) at 2 ("The employees of Fujitec America, Inc. are employees-at-will.  This means that the employment relationship is for no fixed period and is terminable at will at any time by either party.")  "[W]here a party's employment is at-will, the existence of a bonus policy does not create [a] restriction on an employer's discretion to fire the employee at any time." Welland, 2003 WL 22973574, at *15 n.17 (rejecting implied covenant claim where an employer terminated an employee, "thus precluding him from receipt of a bonus.").  "New York law does not impose a duty of good faith and fair dealing with respect to termination of an at-will employment agreement." Mirabella v. Turner Broad. Sys., Inc., 01 Civ. 5563 (BSJ), 2003 WL 21146657, at *1 (S.D.N.Y. May 19, 2003).

To the extent that Gatto is arguing that Fujitec terminated his employment in order to avoid paying him incentive compensation, the Second Circuit has held that an at-will employee may

Even if the Sales Incentive Program Agreements did not give Fujitec absolute discretion – and they do – Fujitec would still be entitled to summary judgment on Gatto's breach of contract claim.

In seeking summary judgment on Gatto's breach of contract claim, Fujitec asserts that "as a matter of law, the incentive pay was not earned because the amounts to be paid by the customers remained subject to adjustment." (Def. Br. (Dkt. No. 43) at 22 n.1)

"Where a compensation plan provides that incentive compensation is not earned until the end of a production period – when appropriate adjustments can be made to calculate the 'net figure[s]' to which employees are entitled – the incentive compensation does not vest, and thus does not qualify as 'wages,' until after the amounts due are determined." Levy v. Verizon Info. Servs., Inc., 498 F. Supp. 2d 586, 601 (E.D.N.Y. 2007) (quoting Dean Witter Reynolds Inc. v. Ross, 75 A.D.2d 373, 381-82) (alteration in original). Indeed, parties may include provisions in their contracts that dictate that "computation of a commission will include certain downward adjustments from gross sales, billings or receivables. In that event, the commission will not be deemed 'earned' or vested until computation of the agreed-upon formula." Pachter v. Bernard Hodes Grp., Inc., 10 N.Y.3d 609, 617-18 (2008).

_____

recover on an implied covenant claim where the employee can prove that the employer terminated his or her employment out of "a desire to avoid payment of earned commissions . . . which are otherwise owed." Wakefield v. N. Telecom, Inc., 769 F.2d 109, 112 (2d Cir. 1985). But the commission or bonus at issue must be earned and owed. "In cases where no fixed amount was due at the time of termination, courts have refused to place a restriction on employer's unfettered discretion to fire an at-will employee at any time." Plantier v. Cordiant plc, 97 Civ. 8696 (JSM), 1998 WL 661474, at *3 (S.D.N.Y. Sept. 24, 1998) (rejecting implied covenant claim because at-will employee's "bonus was at all time[s] discretionary and none was due when she was terminated."); see also Mirabella, 2003 WL 21146657 at *2 (rejecting implied covenant claim because "performance incentives for which [at-will] plaintiff was eligible were entirely discretionary"). Here, Gatto's incentive compensation was entirely discretionary, and accordingly he was not owed any incentive compensation at the time of his termination, and thus he has no valid implied covenant claim.

The facts here are analogous. All of Gatto's sales in 2019 were repair sales (Def. R. 56.1 Stmt. (Dkt. No. 44) ¶ 94), and accordingly each 2019 order listed in his Complaint is subject to the requirement that it must be fully completed, closed, and paid in full before he could realize any incentive compensation. Under the 2020 Sales Incentive Compensation Agreement, every sale – whether a repair order or a service maintenance order – is subject to the "booked/closed/paid in full" requirement. As discussed above, it is undisputed that "Fujitec elected to pay [Gatto] $13,275.00 after his termination for sales that Mr. Gatto booked, that were completed and that were paid in full by the customer by the time of Mr. Gatto's termination." (Rennekamp Decl. (Dkt. No. 40) ¶ 10; id., Ex. C; Def. R. 56.1 Stmt. (Dkt. No. 44) ¶ 132) As such, Gatto is seeking incentive compensation for orders that – at least as of his termination on October 12, 2020 – were not yet completed or paid in full. But the Sales Incentive Program Agreements require that orders be completed and paid in full as a condition of eligibility – in part because customers may change or cancel their order, thereby affecting the amount of incentive compensation that Gatto could receive. (See Def. R. 56.1 Stmt. (Dkt. No. 44) ¶ 106 (noting that "if a customer cancels . . . [t]he incentive would have to be reversed." (quoting Pltf. Dep. (Dkt. No. 35-3) at 62:16-63:13))

Because (1) Gatto is not entitled to any incentive compensation on repair orders in 2019 or any orders in 2020 that were not completed or paid in full at the time of his termination; and (2) it is undisputed that he has already been paid for repairs and service orders that were completed and paid in full at the time of his termination, he is not entitled to any of the compensation that he seeks in the Complaint.

### B.   New York Labor Law Claims

"Article 6 of the New York Labor Law regulates the payment of wages by employers to employees." Michalek v. Amplify Sports & Ent. LLC, 11 Civ. 508 (PGG), 2012

WL 2357414, at *3 (S.D.N.Y. June 20, 2012) (internal citations and quotations omitted).  Under NYLL Article 6, Gatto asserts claims for violations of NYLL § 191, relating to unpaid commissions, and under NYLL § 193, for improper deduction of wages.  (Cmplt. (Dkt. No. 1-1) ¶¶ 34-35)  Gatto also alleges a claim under NYLL § 215 for retaliation, arguing that Defendant "terminat[ed] his employment after he complained about Defendant['s] failure to pay him earned commissions."  (Id. ¶ 45)

In their cross-motions for summary judgment, Plaintiff and Defendant essentially repeat the arguments they made in connection with Plaintiff's breach of contract claim.  (Pltf. Br. (Dkt. No. 35-10) at 8-11; Def. Br. (Dkt. No. 43) 21-24)  Fujitec also argues that – because Gatto lived and worked primarily in New Jersey – he is not covered by the NYLL, and that Fujitec's termination of Gatto's employment was not motivated by retaliatory animus.  (Def. Br. (Dkt. No. 43) at 19-21, 24-26)

Even assuming arguendo that the NYLL applies to Gatto's claim for incentive pay, Fujitec is nonetheless entitled to summary judgment.  "A claim under Article 6 of the New York Labor Law for the payment of wages 'rises and falls with a plaintiff's claim for breach of contract.  Failure to establish a contractual right to wages necessarily precludes a statutory claim under New York's labor law.'"  Apple Mortg. Corp. v. Barenblatt, 162 F. Supp. 3d 270, 289 (S.D.N.Y. 2016) (quoting Simas v. Merrill Corp., 02 Civ. 4400 (RCC), 2004 WL 213013, at *2 (S.D.N.Y. Feb. 4, 2004)); Tierney v. Capricorn Invs., L.P., 189 A.D.2d 629, 632 (1st Dept. 1993) ("The plaintiff cannot assert a statutory claim for wages under the Labor Law if he has no enforceable contractual right to those wages.").  As discussed above, Gatto has no contractual right to the incentive compensation at issue here.  Accordingly, his claims under NYLL §§ 191 and 193 fail as a matter of law.

Gatto's retaliation claim is governed by NYLL § 215(1), which provides as follows:

> No employer . . . shall discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee (i) because such employee has made a complaint to his or her employer, or to the commissioner or his or her authorized representative, or to the attorney general or any other person, that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter, or any order issued by the commissioner (ii) because such employer or person believes that such employee has made a complaint to his or her employer, or to the commissioner or his or her authorized representative, or to the attorney general, or to any other person that the employer has violated any provision of this chapter, or any order issued by the commissioner (iii) because such employee has caused to be instituted or is about to institute a proceeding under or related to this chapter, or (iv) because such employee has provided information to the commissioner or his or her authorized representative or the attorney general, or (v) because such employee has testified or is about to testify in an investigation or proceeding under this chapter, or (vi) because such employee has otherwise exercised rights protected under this chapter.

N.Y. Lab. Law § 215(1).

Gatto alleges that he was terminated as a result of his July 2020 "complain[t] about Defendant['s] failure to pay him earned commissions." (Cmplt. (Dkt. No. 1-1) ¶ 45)

A plaintiff alleging retaliation under NYLL § 215 "must first establish a prima facie case of retaliation by showing (1) participation in protected activity known to the defendant, like the filing of a FLSA lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." Mullins v. City of New York, 626 F.3d 47, 53 (2d Cir. 2010). "In the event that a plaintiff has established a prima facie case of retaliation, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." Quintanilla v. Suffolk Paving Corp., 09 Civ. 5331 (AKT), 2019 WL 885933, at *19 (E.D.N.Y.

Feb. 22, 2019). "If successful, the burden shifts back to the employee to produce evidence showing that the employer's proffered reason is pretextual." Id.[10]

For a court to find that a plaintiff has made a complaint "under the New York Labor Law, [p]laintiff[] must show that [he or she] 'complained about a specific violation of the Labor Law.'" Kassman v. KPMG LLP, 925 F. Supp. 2d 453, 472 (S.D.N.Y. 2013) (quoting Castagna v. Luceno, 09 Civ. 9332 (CS), 2011 WL 1584593, at *12 (S.D.N.Y. Apr. 26, 2011)). "An employee need not cite a specific statute," however. Id. Instead, "[a]n informal complaint to an employer that the employer is violating a provision of the Labor Law suffices." Robinson, 2023 WL 4862772, at *22. "Moreover, such complaint does not require citation to the statute; '[a]ll that is required is that the complaint to the employer be of a colorable violation of the statute.'" Castagna, 2011 WL 1584593, at *12 (quoting Weiss v. Kaufman, No. 103473/2010, 2010 WL 4858896, at *2 (N.Y. Sup. Ct. Nov. 18, 2010)).

As an initial matter, while Gatto asserts that he engaged in "protected activity," neither the Complaint nor his summary judgment briefing articulates what the alleged "protected activity" is. The Complaint merely states that Gatto "complained about Defendant['s] failure to pay him earned commissions." (Cmplt. (Dkt. No. 1-1) ¶ 45) And in Gatto's summary judgment brief, he asserts that he "engaged in protected activity before[] [his termination]" and that he will "explain[] below" what that protected activity was. But Gatto never does so. (Pltf. Br. (Dkt. No. 35-10) at 12) Finally, in his opposition to Defendant's motion for summary judgment, Gatto asserts that "there is a close temporal proximity between Plaintiff's complaint and his unlawful

---

[10] While the cited cases discuss the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) as it applies to the Fair Labor Standards Act ("FLSA"), "[t]he burden-shifting standard for a retaliation claim under the NYLL is the same as that under the FLSA." Robinson v. De Niro, 19 Civ. 9156 (LJL), 2023 WL 4862772, at *21 (S.D.N.Y. May 25, 2023) (internal citations and quotations omitted).

termination," citing his R. 56.1 Counterstatement at ¶¶ 109 and 127. (Pltf. Opp. (Dkt. No. 42) at 15) But Gatto never identifies the "complaint" that is the basis for his claim that he engaged in protected activity.

Despite Gatto's failure to identify the conduct that he claims constitutes protected activity, this Court will assume – for purposes of the cross-motions for summary judgment – that Gatto is referring to a July 2020 email chain with the subject line: "Repair 4036 SRB40," in which Gatto tells Lindsey that he "would like to get paid for this in Q2. The job is completed and we are paid in full. If you can help it would be greatly appreciated." (Pltf. Mot., Ex. F (Dkt. No. 35-7) at 32)

In moving for summary judgment on Gatto's NYLL retaliation claim, Fujitec contends that Gatto has not shown that he "made a complaint about the violation of New York Labor Law and was terminated or otherwise penalized, discriminated against, or subjected to an adverse employment action as a result.'" (Def. Br. (Dkt. No. 25) at 24 (quoting Esmila v. Cosmopolitan Club, 936 F. Supp. 2d 229, 238-39 (S.D.N.Y. 2013)) Fujitec further contends that "Plaintiff's Motion does not assert that Plaintiff engaged in a protected activity, or that a protected activity was causally connected to Plaintiff's termination." (Def. Opp. (Dkt. No. 47) at 14) Finally, Fujitec argues that it "has proffered legitimate, nonretaliatory reasons for its actions: Plaintiff's reassignment of certain contracts, and the related incentive compensation, to himself." (Def. Br. (Dkt. No. 25) at 25) Gatto does not respond to any of these arguments.

The Court concludes that Gatto has not established a prima facie case of retaliation. Even assuming that the premise for Gatto's retaliation claim is his email to Lindsey, that email does not constitute a complaint, and thus it does not constitute protected activity. Gatto's statement that he "would like to get paid for this in Q2" cannot reasonably be construed

as a complaint that Fujitec is violating the 2020 Sales Incentive Program Agreement, much less the NYLL. Indeed, prior to sending his email to Lindsey, Gatto was told that the repair order he was inquiring about "had not been 'closed out[,]' and therefore the incentive compensation associated with that repair order would not be paid to Plaintiff until a later time." (Def. R. 56.1 Stmt. (Dkt. No. 44) ¶ 108) Gatto does not dispute that he was so informed, and he does not allege that he was entitled to incentive compensation at that time for that specific repair order under the 2020 Sales Incentive Program Agreement. And – as discussed above – Gatto does not even allege that his July 2020 email to Lindsey constitutes protected activity. Indeed, his Local R. 56.1 Statement does not even mention the July 2020 email to Lindsey.

In sum, Gatto requested an accommodation; he asked to receive an incentive compensation payment earlier than was permitted under the 2020 Sales Incentive Program Agreement. But his request cannot reasonably be construed as a complaint that Fujitec was violating the NYLL. And given that Gatto has not even alleged that he was entitled to be paid incentive compensation at that time under the 2020 Sales Incentive Program Agreement, this Court cannot find that his email constituted even "[a]n informal complaint to an employer that the employer is violating a provision of the Labor Law." Robinson, 2023 WL 4862772, at *22; see also Castagna, 2011 WL 1584593, at *12.

Accordingly, Fujitec is entitled to summary judgment on Plaintiff's NYLL claims.

### C.    Unjust Enrichment and Quantum Meruit Claims

Counts Three and Five of the Complaint assert claims for quantum meruit and unjust enrichment. (Cmplt. (Dkt. No. 1-1) ¶¶ 62-28, 75-80) Gatto argues that "if the Court finds that there is no enforceable contract between the parties, at least insofar as Plaintiff's termination and compensation is concerned, then Plaintiff should be awarded judgment based on either of the following quasi-contract theories." (Pltf. Br. (Dkt. No. 35-10) at 17) Fujitec contends that

26

"claims for unjust enrichment and quantum meruit cannot survive when there is no dispute that a valid contract existed between the parties."  (Def. Br. (Dkt. No. 43) at 29)

"Unless there is a dispute over the existence of a contract or the contract does not cover the dispute at issue, a contract will not be implied in fact."  Simas, 2004 WL 213013, at *7.  "In other words, there can be no equitable relief where there is an express (written or oral) contract governing the subject matter at hand."  Id. (citing Sugerman v. MCY Music World, Inc., 158 F.Supp.2d 316, 326 (S.D.N.Y.2001)); see also Clark-Fitzpatrick, Inc. v. Long Island R. Co., 70 N.Y.2d 382, 389 (1987) ("It is impermissible . . . to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties.").

As discussed above, it is undisputed that the Sales Incentive Program Agreements are unambiguous, enforceable contracts that govern the parties' dispute.  "The only dispute is over whether plaintiff was owed commissions and if so, how much.  Accordingly, plaintiff cannot maintain a cause of action for equitable relief – whether as unjust enrichment or quantum meruit."  Simas, 2004 WL 213013, at *8.

Accordingly, Fujitec is entitled to summary judgment on Plaintiff's quasi-contract claims.

**D.    Declaratory Judgment**

In Count Four of the Complaint, Gatto seeks a declaration "that Defendant breached the Agreement, that the Agreement is enforceable against Defendant, and that Defendant is liable to Plaintiff for his commissions and compensation owed under the Agreement." (Cmplt. (Dkt. No. 1-1) ¶¶ 69-74)  As discussed above, Gatto is not entitled to any additional incentive compensation payments under the 2019 and 2020 Sales Incentive

27

Compensation Agreements.  Accordingly, Gatto is not entitled to a declaration that Fujitec has

breached those agreements.

**<u>CONCLUSION</u>**

For the reasons stated above, Defendant Fujitec's motion for summary judgment

(Dkt. No. 38) is granted, and Plaintiff Gatto's motion for summary judgment (Dkt. No. 35) is

denied.  The Clerk of Court is directed to terminate the motions, to enter judgment for

Defendant, and to close this case.

Dated: New York, New York
      September 26, 2024           SO ORDERED.

                                    Paul G. Gardephe
                                    United States District Judge